# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
**Urbana Division**

| | |
|---|---|
| **GEORGIANA BYARS,** ) | |
|           **Plaintiff,** ) | |
| **v.** ) | |
| ) | **Case No. 05-2071** |
| **MACON RESOURCES, INC.,** ) | |
| ) | |
|           **Defendant.** ) | |

# ORDER

In March 2005, Plaintiff, Georgina Byars, acting *pro se*, filed a Complaint (#3) against Defendant, Macon Resources, Inc., alleging that Defendant violated Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII") (42 U.S.C. §§ 2000e-2, 2000e-5). Federal jurisdiction is based on federal question (28 U.S.C. § 1331) because Plaintiff's claim is based on a federal statute. The parties have consented to jurisdiction by a federal magistrate judge.

In January 2006, Defendant Macon Resources (hereinafter "MRI") filed a Motion for Summary Judgment (#27). After reviewing Defendant's motion and the parties' memoranda and evidence, the Court **GRANTS** Defendant's Motion for Summary Judgment **(#27)**.

### I. Standard of Review

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, the Court must decide, based on admissible evidence, whether any material dispute of fact exists that requires a trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The party seeking summary judgment bears the initial burden of showing that no such issue of material fact exists. *Celotex,* 477 U.S. at 323.

The Court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). However, the

nonmoving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, she must go beyond the pleadings and support her contentions with proper documentary evidence.  *Celotex,* 477 U.S. at 322-23.  A scintilla of evidence in support of the nonmovant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [nonmovant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Id.*  "In such a situation there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.*

## II.  Background
### A.  Plaintiff's Leave of Absence

Plaintiff's complaint alleges that MRI terminated her employment because of her race.  The undisputed facts are as follows:  MRI provides rehabilitative training programs and support services to individuals with developmental disabilities, mental illness, or other handicaps, and to their families.  Plaintiff, an African American, began working for MRI around July 1989.  In August 2002, she was working full time as a Case Management Aide.

In August 2002, Plaintiff was injured in an automobile accident during her vacation.  As a result, she was physically unable to return to work at the end of her vacation.  She was eligible to take a leave of absence under the Family and Medical Leave Act (hereinafter "FMLA") and on August 12, 2002, she began an FMLA leave of absence.  On August 13, 2002, Carolyn Alderson, MRI's Benefits Coordinator, sent Plaintiff a letter (#27, Attachment #3, p. 7) containing information about the FMLA leave.  Among other things, the letter stated that Plaintiff was eligible for twelve weeks of leave and that "[d]uring this leave you will be expected to use your accrued sick/vacation/personal time before having unpaid leave time."  (#27, Att. #3, p. 7.)

Plaintiff states that, as of July 26, 2002, she had a total of 264.74 hours accrued, including sick time (217.75 hours), vacation time (40.74 hours), and personal time (6.25 hours). (#29, Att. #4, p. 16.)  Her FMLA leave record shows that vacation time and sick time was applied to Plaintiff's FMLA leave between August 15 and October 11, 2002.  (See #27, Att. #4, p. 22.)  Thus, part of her FMLA leave was paid and part was unpaid.

On October 29, 2002, Plaintiff sent a letter to John Mallaney, asking that her leave of absence be extended for another eight weeks beginning November 10, 2002.  (#27, Att. #3, p. 8.)

On November 21, 2002, Carolyn Alderson sent Plaintiff a letter (#27, Att. #3, p. 9) stating that Plaintiff had exhausted all of her FMLA leave time as of November 7, 2002, and agreeing to extend her medical leave through December 31, 2002.  The letter stated that Plaintiff must provide documentation from her doctor on her medical status and prognosis.  If MRI's Human Resources Department did not receive the information by December 2, 2002, the extension would be cancelled and Plaintiff's employment would be considered terminated as of November 30, 2002.  The letter also offered Plaintiff an additional extension up to February 1, 2003.  In order for Plaintiff to take advantage of that final extension, she was required to pay, in advance, for her insurance benefits for the month of January.

On December 17, 2002, Carolyn Alderson sent Plaintiff a letter and a claim form for long-term disability.  (#27, Att. #3, p. 10.)  The letter stated, in pertinent part, as follows:

> I am aware that you have discussed with John Mallaney the possibility of returning to work and delaying your shoulder surgery.  If this does not occur, and you want to continue your general medical leave for the month of January, the insurance premiums for January are $499.44.  If you do not continue the general medical leave or return to work, then your insurance will end on December 31, 2002.  You would be eligible under the COBRA provision to continue to pay for insurance coverage.  You would also be eligible for re-hire for any position for which you are qualified.

(#27, Att. #3, p. 10.)

On December 19, 2002, Plaintiff's doctor, Marshall Brustein, wrote a letter stating that Plaintiff was unable to return to work at that time, and that he planned to schedule surgery. (#29, Att. #4, p. 58.)

On December 20, 2002, Plaintiff met with Carolyn Alderson to discuss health insurance benefits. After the meeting, Alderson sent an internal memorandum to Gene Hurelbrink stating as follows:

> Gina [(Plaintiff)] came in today (12/20) with a doctor's note indicating she is still not released to return to work even on an accommodated basis. She said she would not be paying her insurance and would have to take the rehire option. She hates to give up her job and would like to return. She wanted to know if on a rehire basis she would give up her rate of pay. I told her it would depend on what position she came back to, when, etc. and that this decision wasn't up to me but her previous work record would be considered.

(#27, Att. #3, p. 11.)

Regarding the December 20, 2002, meeting with Alderson, Plaintiff states that she was willing to pay her January insurance premiums if she could make payments once she returned to work at MRI. (#27, Att. #4, p.16.) She did not want her job to be terminated. She assumed she could start paying for her January insurance benefits once she got back to work and she claims Carolyn Alderson did not tell her any different. (#27, Att. #4, p.16.) However, Alderson's letter dated November 21, 2002, clearly stated that Plaintiff must pay in advance for her January insurance benefits. Furthermore, this was consistent with MRI's policy. It is undisputed that Plaintiff did not pay the premium for her January 2003 insurance premiums in advance. Accordingly, Plaintiff's statement that she was willing to arrange to pay the premiums when she returned to work does not raise a factual dispute on this issue.

On December 26, 2002, MRI posted an opening for Plaintiff's position. On December 31, 2002, MRI terminated Plaintiff's employment when Plaintiff failed to pay for her January 2003 insurance benefits. Alderson testified that MRI terminated Plaintiff's employment because it could no longer justify absorbing the cost of Plaintiff's insurance benefits. (Alderson Aff., ¶ 6.)

On January 27, 2003, Plaintiff's doctor released Plaintiff to return to light-duty work. (#27, Att. #4, p. 17.)  On March 7, 2003, Plaintiff's doctor released her to return to work with no restrictions.  (#29, Att. #4, p.50.)  On April 16, 2003, Plaintiff's doctor released her to return to work full time without restrictions.  (#29, Att. #4, p. 51.)

During the first part of 2003, Plaintiff continued to watch for job openings at MRI.  In April 2003, Plaintiff completed an application for any job that became available, but nothing was available.  Plaintiff states that she did not decline a position as a Day Vocational Trainer; instead, no positions were available.  In June 2003, Plaintiff applied for a Lead Day Vocational Services position.  She was not hired for the job.  (#29, Att. #4, p. 49.)

In May 2003, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC"), stating that she was discharged because of her race.  In January 2005, the EEOC issued a right-to-sue letter.  Notwithstanding Plaintiff's reference to the Age Discrimination in Employment Act (29 U.S.C. §§ 621-634) and the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 *et seq.*), the EEOC charge does not refer to either disability or age discrimination.  Therefore, the Court will limit its discussion to race discrimination.

### B.  MRI's FMLA Policy and the FMLA

Plaintiff has submitted a copy of MRI's Policy and Procedure Directive (hereinafter "Directive") that lists effective dates of November 17, 1993, and November 26, 2000.  (*See* #23, p. 30; #29, Att. #4, p. 14.)  Defendant has submitted that same version of the Directive and another version listing effective dates of November 17, 1993, and November 28, 2001 (#27, Att. #3, pp. 12-17).

In her affidavit, Plaintiff states that, "I was not granted that time off [her request dated October 29, 2002, for an extension], Macon Resources Inc. had combined FMLA time with accrued time.  At sometime or another MRI changed their policy."  (Plaintiff's Aff., ¶ 8.)  Other than this statement, Plaintiff has not explained what changes she thinks were made to the

5

Directive and how those purported changes affected her claim.  Based on the versions of the Directive submitted by the parties, it appears that MRI amended its Directive between November 2000 and November 2001.  However, none of the events at issue in this case occurred before the effective date of the November 2001 version of the Directive.  Because the November 2001 version of the Directive was in effect at the time of the events in this case, the Court will use that version of the Directive in its consideration of the motion.

>The Directive states, in pertinent part, as follows:
>
>e.      Unpaid leave shall be approved only if the employee has no accrued sick, vacation, or personal time available.  Accruals shall continue only for the time the employee is on paid leave.  All FMLA leave, both paid and unpaid, is excluded when calculating the attendance portion of the performance evaluation and for salary considerations.  All accrued benefit time used for FMLA leave shall be documented as such on both the timesheet and the Request for Leave form.
>. . . .
>The employee approved for unpaid family and medical leave under this policy is eligible to continue existing MRI group health and dental insurance coverage only for the duration of such FMLA leave, and under the same conditions normally applicable to the employee.  However, an employee on such leave is still liable for the current premium(s) for dependent coverage with full payment required in advance of the month of coverage.  Failure to make timely payment of the premium(s) for dependent coverage shall result in termination of that specific coverage.
>
>Should an employee request and receive a leave extension beyond the available FMLA time, it shall be at MRI's discretion if that employee can continue the group health and dental coverage.  If allowed to continue, it shall be at the employee's expense beginning with the first full month following the effective date of the leave extension.  Again, the full month's premium must be paid in advance of each month of coverage.

(Directive, p. 4, ¶ 2e (#27, Att. #3, p. 15).)

The FMLA provides that leave under FMLA "may consist of unpaid leave."  29 U.S.C. § 2612(c).  Alternatively, "an employer may require the employee, to substitute any of the

accrued paid vacation leave, personal leave, or medical or sick leave of the employee for [unpaid] leave." 29 U.S.C. § 2612(d).[1]

### C.  Terri Kearney

Terri Kearney worked for MRI from 1991 to May 2003, except for the period of May 31, 1995, to August 19, 1996.  (Kearney Aff., ¶ 2.)  In January 1998, she began working as an Individual Program Manager, a full-time position with benefits.  (Kearney Aff., ¶ 3.)

On January 11, 1999, Terri notified MRI that she needed to take a leave of absence to care for her daughter's serious health condition.  (Kearney Aff., ¶ 4.)  On January 21, 1999,

---

[1]Section 2612(d) of the FMLA provides as follows:

(d) Relationship to paid leave

(1) Unpaid leave

If an employer provides paid leave for fewer than 12 workweeks, the additional weeks of leave necessary to attain the 12 workweeks of leave required under this subchapter may be provided without compensation.

(2) Substitution of paid leave

(A) In general

An eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or family leave of the employee for leave provided under subparagraph (A), (B), or (C) of subsection (a)(1) of this section for any part of the 12-week period of such leave under such subsection.

(B) Serious health condition

An eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee for leave provided under subparagraph (C) or (D) of subsection (a)(1) of this section for any part of the 12-week period of such leave under such subsection, except that nothing in this subchapter shall require an employer to provide paid sick leave or paid medical leave in any situation in which such employer would not normally provide any such paid leave.

29 U.S.C. § 2612(d).

French Wilson, the Human Resources Director for MRI at that time, sent Terri a letter informing her that MRI had approved her request and allocated her a total of 480 hours of FMLA leave. (Kearney Aff., ¶ 5; #29, Att. #4, p. 27.) Her leave was classified as "Intermittent Leave." (Kearney Aff., ¶ 5; #29, Att. #4, p. 27.) Terri's FMLA leave record shows that when Terri was first on FMLA leave, her accrued vacation time and sick time was applied to the FMLA leave until it was exhausted. (#27, Att. #4, pp. 24-25.) Then her FMLA leave was unpaid. As a result, part of her FMLA leave time was paid and part was unpaid. (Kearney Aff., ¶ 2; #27, Att. #4, pp. 24-25.)

On December 9, 1999, Terri notified MRI that her daughter needed extensive care. (Kearney Aff., ¶ 8.) On December 21, 1999, Wilson sent Terri a letter notifying her that her leave would now be classified as "Full Day Leave." (Kearney Aff., ¶ 9; #29, Att. #4, p. 31.) The effective date for Kearney's leave under this classification (full day FMLA leave) was November 29, 1999. (#29, Att. #4, p. 31.) Terri's FMLA leave record indicates that MRI did not allocate her any additional leave hours as a result of her December 1999 request. (#27, Att. #4, pp. 24-35.) The only effect of her December 1999 request was to change her leave classification from "intermittent" to "full day."

From January 11, 1999, through November 28, 1999, Terri used twenty-seven hours of FMLA leave. (Kearney Aff., ¶ 6.) From November 29, 1999, through February 16, 2000, Terri used 453 hours, the remainder of her FMLA leave. (#27, Att. #4, pp. 24-25.) Thus, her FMLA leave totaled 480 hours. (#27, Att. #4, pp. 24-25.) From February 16, 2000, through February 29, 2000, MRI allowed Terri to take time off without pay. (Kearney Aff., ¶ 12.) Terri returned to full-time work on March 1, 2000. (Kearney Aff., ¶ 12.)

On March 30, 2000, Terri requested additional time off to care for her daughter. (Kearney Aff., ¶ 13.) MRI denied this request, informing her that she had used all her FMLA leave and was not eligible to take more time off. (Kearney Aff., ¶ 13.) MRI did not offer to extend her FMLA leave of absence beyond the two extra weeks from February 16 through

February 29, 2000, nor did MRI offer to extend her FMLA leave if she agreed to pay for her health insurance benefits. (Kearney Aff., ¶¶ 19-20.)

On July 7, 2000, Terri gave up her position as Individual Program Manager and began working as a Day Vocational Trainer, a temporary status position with reduced hours and pay, and no benefits. (Kearney Aff., ¶¶ 15-17.)

Plaintiff has filed a Response to Affidavit of Terri Kearney, in which she states her disagreement with some of these facts. (#29, Att. #3.) She also filed letters from two other employees about Kearney's work situation. (#29, Att. #4, pp. 56-57.) The Court will not consider the employee letters because they do not constitute admissible evidence sufficient to raise an issue of fact. See FED. R. CIV. P. 56(e) (stating that affidavits shall be made on personal knowledge and shall set forth such facts as would be admissible in evidence.) Furthermore, the documentary evidence confirms the statements in Kearney's affidavit. Thus, the Court concludes that Plaintiff has not raised a genuine issue of fact regarding Kearney's testimony.

### III. Analysis

Title VII makes it unlawful for an employer to discriminate against an individual in her employment based on that person's race. 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove discrimination by presenting direct or circumstantial evidence of intentional discrimination, or she may proceed under the burden-shifting method established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-03 (1973). *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 831-32 (7th Cir. 2005).

Plaintiff's complaint alleges that Defendant violated Title VII by terminating her employment because of her race. Defendant argues that the Court should grant summary judgment in its favor for the following reasons: (1) Plaintiff has offered no direct evidence of discrimination; (2) under the indirect method, Plaintiff failed to establish a *prima facie* case of discrimination because Plaintiff failed to show that she was meeting MRI's legitimate

expectations or that MRI treated a similarly-situated employee better than it treated Plaintiff; and (3) Plaintiff has failed to establish pretext.

### A. Direct Evidence

To prove discrimination using direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Jordan*, 396 F.3d at 832 (quoting *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 616 (7th Cir. 2000)). Alternatively, a plaintiff may defeat summary judgment under the direct method of proof by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decision-maker." *Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 737 (7th Cir. 1994)).

The Court has carefully reviewed Plaintiff's response to the motion and her deposition. In her deposition, she testified that Kay Scrogin, French Wilson, and John Mallaney were responsible for terminating her employment because of her race. (Pl. dep., p. 8.) However, she offered nothing more than her own beliefs and speculation to support that statement. In fact, she testified that the only evidence she has that MRI terminated her employment because of her race is that MRI treated Terri Kearney better than it treated her. (Pl. dep., pp. 7-8.)

To defeat summary judgment, a party must present evidence that affirmatively demonstrates the existence of a genuine issue of material fact. *Celotex,* 477 U.S. at 324. The summary judgment rule states that a party may rely on pleadings, depositions, answers to interrogatories, and admissions on file, and affidavits for purposes of raising a genuine issue of material fact. FED. R. CIV. P. 56(c). However, to be admissible, the evidence must be based on personal knowledge. FED. R. CIV. P. 56(e) ("affidavits shall be made on personal knowledge"); FED. R. EV. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Furthermore, although personal knowledge may include reasonable inferences, those inferences must be "grounded in observation or other first-hand personal experience. They must not be flights of

**10**

fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Visser v. Packer Eng'g Assoc.,* 924 F.2d 655, 659 (7th Cir. 1991) (en banc).

The Court has carefully reviewed all of Plaintiff documents and her deposition testimony and concludes that they fail to present any direct or circumstantial evidence of discrimination that would defeat summary judgment under the direct method of proof.

### B. Indirect Evidence

To establish a *prima facie* case of race discrimination in employment under the indirect method, a plaintiff must show the following: (1) she is a member of a protected class; (2) her performance met the defendant's legitimate expectations; (3) she suffered an adverse employment action; and (4) the defendant treated other similarly-situated persons outside of the plaintiff's classification more favorably. *Bratton v. Roadway Package Sys. Inc.,* 77 F.3d 168, 176 (7th Cir. 1996) (citing *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged action. *Id.* Once the defendant does so, the burden of production shifts back to the plaintiff to prove by a preponderance of the evidence that the reason proffered by the defendant is actually a pretext for discrimination. *Id.*

Here, Defendant contends that Plaintiff failed to establish the second and fourth elements of the *prima facie* case. The Court finds the fourth element dispositive, and will not address the other elements.

#### 1. Similarly-Situated Individual

In her response, Plaintiff contends that MRI treated Terri Kearney more favorably than it treated her. Specifically, she contends that Kearney was treated more favorably as to the FMLA leave of absence because Kearney was given two separate leaves and the conditions of Kearney's FMLA leave was more favorable. In addition, she contends that Kearney was not required to reapply when she transferred to a part-time position.

**11**

As an initial matter, the evidence shows that Kearney was not given two separate leaves. As the Court noted above, when MRI first initiated Kearney's FMLA leave in January 1999, the leave was classified as *intermittent*. Later that year, in December 1999, Kearney submitted another request for FMLA leave, this time on a *full-time* basis. Kearney's FMLA leave record shows that MRI switched her to full-time leave when she had already used 27 hours of her FMLA leave, and she used an additional 453 hours while she was on full-day leave. The record also shows that MRI allowed Kearney a total of 480 hours for her FMLA leave, the same number of hours it allowed Plaintiff. The only thing that changed as a result of Kearney's December 1999 request was the classification of her FMLA leave from intermittent to full day. Thus, MRI did not allow Kearney two separate leaves or additional FMLA leave time.

Next, Plaintiff argues that MRI treated Kearney more favorably in terms of extending her FMLA leave. The facts do not support this claim. Plaintiff was allowed to take 480 days of FMLA leave, given an extension of approximately eight weeks from November 7, 2002, until December 31, 2002, and then offered *another* extension until February 1, 2003, contingent on Plaintiff paying in advance for her January insurance premiums.

In contrast, after exhausting her 480 hours of FMLA leave, Terri Kearney was allowed to take only an additional two weeks off without pay. She then returned to full-time work. When she asked for additional leave on March 30, 2000, MRI denied her request. To summarize, the evidence shows that, after Kearney and Plaintiff had each exhausted their 480 hours of FMLA leave, Plaintiff was allowed to take about five and one-half weeks of unpaid leave more than Kearney *and* MRI offered Plaintiff another extension of four weeks. Thus, the facts show that MRI treated Kearney *less* favorably than it treated Plaintiff.

Plaintiff next argues that Kearney was treated more favorably because she was allowed to transfer to a part-time position without reapplying for employment. However, Kearney was still working for MRI at the time she changed positions. (Kearney Aff., ¶¶ 14-15.) In contrast, Plaintiff was not working for MRI; as a result, she was required to reapply for any position in which she was interested. "A similarly situated employee is one who is 'directly comparable to

[the plaintiff] in all material respects.'" *See Bio v. Fed'l Express Corp.*, 424 F.3d 593, 596 (7th Cir. 2005). Because Kearney was employed by MRI and Plaintiff was not, the two are not similarly situated in terms of their applications for part-time positions.

"The failure to establish any one of the initial four elements defeats a discrimination claim." *Id.* Because Plaintiff has failed to show that MRI treated a similarly-situated employee better than it treated her, she has failed to establish a *prima facie* case of racial discrimination under the indirect method. Therefore, the Court grants Defendant's motion for summary judgment on Plaintiff's claim of race discrimination.

### 2. Pretext

Although not necessary to its decision, the Court will also briefly consider the evidence regarding pretext. If a plaintiff establishes a *prima facie* case of discrimination (which the Court assumes for purposes of this discussion), the defendant bears the burden of offering a legitimate, nondiscriminatory reason for the adverse employment action (in this case, terminating Plaintiff's employment) and showing that it honestly believed those reasons, even if the reasons are foolish, trivial, or baseless. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 984 (7th Cir. 1999). A pretext for discrimination means "a lie, specifically a phony reason for some action." *Millbrook v. IPB, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995)). To demonstrate pretext, the plaintiff "must produce 'significantly probative admissible evidence' from which the trier of fact could infer that the [decision-maker's] reason was false and that the actual reason [for the challenged action] was discriminatory." *Jones v. Union Pac. R.R. Co.,* 302 F.3d 735, 742-43 (7th Cir. 2002) (quoting *King v. Preferred Technical Group,* 166 F.3d 887, 892 (7th Cir. 1999)).

Regarding pretext, Plaintiff refers to the fact that MRI made arrangements for her to participate in a rehabilitation program to facilitate her returning to work. This does not establish pretext.

13

The evidence shows that Carolyn Alderson offered to extend Plaintiff's FMLA leave contingent on Plaintiff paying in advance for her insurance benefits during the extended leave, as required by MRI policy. Plaintiff failed to pay those premiums in advance. Defendant states that it terminated Plaintiff's employment because she did not pay her insurance premium for January 2003 in advance and MRI could not financially justify paying for benefits for a nonworking employee. Plaintiff has offered no evidence to show that this statement was a lie or a phony reason for terminating her. Therefore, Plaintiff has failed to raise a genuine issue of fact as to pretext.

### C. Plaintiff's Other Arguments

Regarding Plaintiff's remaining arguments and discussion, the issues seem to be based on a misunderstanding regarding MRI's FMLA leave policy. Plaintiff argues that she should have been able to use her accrued vacation and sick time *before* her FMLA leave began.[2] However, under MRI's FMLA Directive, FMLA leave may begin before an employee has exhausted her accrued sick time and vacation time. FMLA expressly allows this. *See* 29 U.S.C. § 2612(d)(2)(A, B) (stating "an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or family leave of the employee for [FMLA] leave for any part of the 12-week period of such leave . . ."). Moreover, MRI's Directive provides that an employee must use her vacation and sick time before the employee will be allowed to take unpaid leave. The Directive states as follows: "Unpaid leave shall be approved only if the employee has no accrued sick, vacation, or personal time available." (Directive, p. 4, ¶ 2e.) When an employee has used up her accrued vacation and sick time, the employee's FMLA leave will be unpaid and both paid and unpaid leave are applied against the total FMLA leave time of

---

[2]In Plaintiff's response to the motion for summary judgment, she argues that, if MRI had allowed her to use her accrued vacation and sick time before starting the FMLA leave, then her FMLA leave would have lasted until February 1, 2003. As a factual matter, this appears to be incorrect. Plaintiff stated that, at August 12, 2002, she had approximately 264 hours of accrued sick time, vacation time, and personal time. That would cover thirty-three days or six weeks and three days, delaying the beginning of her FMLA leave until roughly September 26, 2002. If she began her FMLA leave on that date, her FMLA leave would have ended on December 18, 2002, not February 1, 2003.

480 hours.  This is how Plaintiff's FMLA leave played out:  She was paid during the first part of it because she had accrued sick, vacation, and personal time.  The remainder of her FMLA leave time was unpaid.  This is also what happened to Terri Kearney:  At the beginning of Kearney's FMLA leave, her accrued sick and vacation time was applied to her FMLA leave.  After she had exhausted her sick time and vacation time, Kearney's remaining FMLA leave was unpaid.

Plaintiff objects to the application of the policy, but she does not argue that the policy was applied differently to her because of her race.  Furthermore, as noted above, the evidence shows that the same policy was applied to Kearney.  Accordingly, the Court concludes that MRI did not violate Title VII by applying Plaintiff's accrued sick time, vacation time, and personal days to her FMLA leave before allowing her to take unpaid leave.

Plaintiff next argues that she did not refuse to pay for her January insurance premiums because she hoped to arrange to make those payments when she returned to work.  Specifically, she states that she had talked to Carolyn Anderson about "making some type of arrangement" to make the payments upon returning to work.  However, MRI's FMLA Directive clearly provides that the health insurance premiums must be paid in advance of each month of coverage.  *See* Directive, p. 4, ¶ 2e (stating that "the full month's premium must be paid in advance of each month of coverage").  Again, Plaintiff does not contend that this policy was applied differently to her because of her race.  Accordingly, MRI did not violate Title VII by requiring Plaintiff to pay in advance for her January 2003 insurance benefits.

Plaintiff also states that she was released to return to work, and she refers to her exhibits 4 and 5 to support this statement.  Exhibit 4 is a note from her doctor releasing her to return to light duty work beginning January 27, 2003, (Pl. Ex. 4.)  Exhibit 5 is a letter from Unum Life Insurance Company dated April 3, 2003, acknowledging that Plaintiff's doctor had released her to return to work on January 27, 2003, and noting that her job as Case Manager Aide is considered to be "light duty."  Plaintiff does not indicate how the fact that she was released to return to work relates to her claim in this case because her employment had been previously terminated on December 31, 2002.

**15**

Plaintiff also states that Kearney was allowed to return to work even though she owed the company hours.  Plaintiff is referring to the reference on Kearney's FMLA timesheet of -78.88 hours.  That figure indicates the total number of hours that Kearney was allowed to take off without pay.  In contrast, MRI allowed Plaintiff to be absent without pay from November 7 through December 31, 2002, or approximately seven and one-half weeks.  The record shows that MRI allowed Plaintiff to take five and one-half weeks more time without pay than it allowed Kearney.  Therefore, the fact that MRI allowed Kearney to take two weeks off without pay does not constitute evidence that MRI violated Title VII.

Plaintiff believes that she was a victim of racial discrimination and that MRI could have treated her better than it did.  Nevertheless, to defeat a summary judgment motion, a party must present admissible evidence that affirmatively demonstrates a genuine issue of material fact for trial.  *Celotex,* 477 U.S. at 324.  After carefully reviewing Plaintiff's deposition testimony and all of her documents, the Court concludes that Plaintiff has failed to raise a genuine issue of material fact regarding the issues in this case.

## IV.  Summary

For the reasons stated above, the Court **GRANTS** Defendant's Motion for Summary Judgment **(#27).**  This case is terminated.

ENTER this 8th day of March, 2006.

                                                            s/ DAVID G. BERNTHAL
                                                             U.S. MAGISTRATE JUDGE